IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


OMAR CANO-LOPEZ                    )
                                  )
                                  )
VS.                               ) CIVIL ACTION NO.
                                  ) 1:23-CV-44
                                  )
SECRETARY ALEJANDRO               )
MAYORKAS


BENCH TRIAL HEARING
(No opening statements or closing arguments)
BEFORE THE HONORABLE ROLANDO OLVERA
SEPTEMBER 23, 2024



A P P E A R A N C E S


FOR THE PETITIONER:

    MR. JAIME M. DIEZ
    JONES AND CRANE
    PO Box 3070
    Brownsville, Texas 78523


FOR THE RESPONDENT:

    MR. BRENDAN THOMAS MOORE
    MS. LINDSAY M. VICK
    DOJ-Civ
    PO Box 878 Ben Franklin Station
    Washington, DC 20044

THE COURT:  Good morning, ma'am.

THE WITNESS:  Buenos dias.

THE COURT:  Please remain standing.

Let's swear her in.

(WITNESS SWORN IN.)

THE WITNESS:  I swear.

THE COURT:  Please have a seat.  Answer loudly and clearly into the microphone.  Good morning.  Please state your full, correct, legal name, ma'am.

THE WITNESS:  Maria Oralia Juardini.

THE COURT:  And I did not hear the last name, Jura --

THE INTERPRETER:  Juardini.

THE COURT:  Juradine?

THE INTERPRETER:  Juardini.

THE WITNESS:  Juardini.

THE INTERPRETER:  Juardini.

THE COURT:  Jura -- all right.  Am I pronouncing it correct, Juradine?

THE INTERPRETER:  No, Your Honor, Juardini.

THE WITNESS:  Juardini.

THE INTERPRETER:  With an I at the end, Your Honor, Juardini.

THE COURT:  Juardini.

THE WITNESS:  Si.

THE COURT:  All right.  That's more difficult than Cano, but I'll -- I'll try and -- I'll try and get to that.

Ms. Juardini, again, good morning.  I'm going to just ask you a few basics questions, then the attorneys will ask you questions.  If you don't understand a question, please state as such and we'll -- any and all parties will either repeat it or rephrase it.

THE WITNESS:  Okay.

THE COURT:  Okay.  And, first of all, tell me how you know the petitioner Mr. Omar Cano-Lopez.

THE WITNESS:  He's my brother.

THE COURT:  All right.  And is he older or younger than you?

THE WITNESS:  Older.

THE COURT:  All right.  And obviously we're here today to establish his citizenship and the key issue is the number of years that your father spent in the United States before your brother was born.

THE WITNESS:  Okay.

THE COURT:  Please explain to the court what your knowledge is about your father's presence in the United States before your brother was born.

THE WITNESS:  Well, according to my mother's

version of history, she said that he was born here, that he resided here in the United States.

And, according to my grandmother on my father's side, she decided to take him to Mexico when he was five years old.

And then the story is, that during his teen years, he would come and work here in the United States.

And, after that, well, I was very little so -- but I knew that he was working here in the United States all this time.  I hardly saw him, I would hardly see him when he would come and visit.

THE COURT:  Now, respectfully, we're not interested in your father's time in the United States after you were born or after your brother was born, we're only interested in the time he spent in the United States before your brother was born.

And it's my understanding, based on your testimony, that you've learned from this by your mother's version.

Did your father ever tell you his version of his history?

THE WITNESS:  Honestly, I was very young, very little and this is what I've heard from conversations.

THE COURT:  All right.  Obviously the

attorneys are going to get into the family history that you learned from your mother and your father, but with that being said, I'm going to turn the questioning over to Mr. Diez.

Mr. Diez, please proceed.

THE WITNESS:  Okay.

DIRECT EXAMINATION

BY MR. DIEZ:

Q.  Good morning.

A.  Good morning.  Good morning.

Q.  Okay.  I'm going to now ask you a couple of questions about your dad.  Now, you said your dad's name was -- what was the -- your dad's name?

A.  Leonel Cano-Saenz.

Q.  Okay.  And you know what year was he born?

A.  August 1st, 1933.

Q.  Okay.  And -- and we're here to talk about -- you said your brother Omar is younger than you?  Older than you, sorry?

A.  That's right.

Q.  Do you know what year Omar was born?

A.  Omar was born on September 22nd, 1963.

Q.  So, I mean, as the court -- and you were born in '65, correct?

A.  That's right.

Q.   And you did obtain a certificate of citizenship through your -- through your father Leonel, right, so you are a United States citizen?

A.   That's right.

Q.   So I'm going to just show you this so that we can try to keep ourselves focused on this period of time. This is just a table that has 1963 to 1960 -- 1933 to '63, okay?

And that's the year that you said your brother was born.  Your dad was born in August of '33, according to your testimony, correct?  Can you see it?

A.   Si.   Si.

THE INTERPRETER:   It's blurry, Mr. Diez.

MR. DIEZ:   Monde?

THE INTERPRETER:   It's blurry.

MR. DIEZ:   It's blurry?

THE INTERPRETER:   Okay.   Now it's clear, yes.

THE COURT:   And -- and, forgive me, Mr. Diez, at least my notes indicate the -- the plaintiff/petitioner was born in February of '63, I thought you said -- I think you're saying September.

MR. DIEZ:   No, she testified that it was -- that -- that he was born on -- on September of '63.

Q.   (By Mr. Diez)   You said September '63 your -- the

petitioner was born, your brother? September, yes, I think. Am I wrong?

A. Si, Septiembre 22.

MR. DIEZ: Yeah, it -- it is September.

THE COURT: All right. Then my --

THE WITNESS: Yes, my brother was born September 22nd.

THE COURT: -- my annotation of February 22nd is incorrect.

MR. DIEZ: And, I'm sorry, maybe I put it wrong in somewhere but no but he was born Sep --

Q. (By Mr. Diez) So your brother was born September 23 -- September of 1963.

So your dad was 30 years old and one month when you -- when he was born, correct?

A. That's right.

Q. Now, your mother's name was Oralia?

A. Oralia.

Q. All right. Your father is -- is already dead, correct?

A. (Spanish spoken.)

Q. How long ago did he pass away?

A. He passed away already.

Q. How long ago he died?

A. He passed away about three years ago, more or

less, I -- I don't remember.

Q.  Okay.  And -- and your mother is she alive?

A.  Yes.

Q.  And who she lives with?

A.  She lives by herself.

Q.  You live here in Brownsville?

A.  Yes.

Q.  Now, I'm going to ask you, ma'am, some questions about the history of your family before Omar was born, okay?

A.  Okay.

Q.  Okay.  Do you know who -- what was the name of your father's mother?

A.  Josephina Cano.

Q.  Okay.  And I'm going to show you what's been marked as exhibit number -- it's exhibit number 3, plaintiff's exhibit number 3.

    And this is, you can look at it, is that your father?

A.  Yes.

Q.  Can you read and write in English?

A.  No.

Q.  Okay.  So that's Leonel Cano, that's your father, correct?

A.  Yes.

Q.   And it says that his mother is Josephina Cano?

A.   Yes.

Q.   And what about his father, do you -- do you know who's -- there is no father name on your dad's name, do you know who his father was?

A.   Yes, my mom would mention that his name was Emilio Sada.

Q.   And do you know where your mom met Emilio Sada?

THE COURT:  Mr. Diez, where are going with this?  Again, this family history's irrelevant.

MR. DIEZ:  Just to show why he was living here up until age five.

THE COURT:  I think it's undisputed he was born here, let -- let's get to the time he spent here, I don't need the family history.

MR. DIEZ:  No, the reason I was going is because that -- his mother was working for that gentlemen when he was --

COURT REPORTER:  Was or was not?  Could you use the microphone, please.

MR. DIEZ:  Her mother was working in the United States, Josephina, and when he was born and he had a child before and that's why he was -- that's why she was living in -- and he spent the first five years or part of his childhood, Leonel, in the United States.

That's where I was going with that question.

THE COURT:  I don't think it's disputed that he spent the first 16 months here, so I -- don't --

MR. DIEZ:  Okay.

THE COURT:  -- if you're trying to say he spent five years instead of 16 months, that's a different issue.

MR. DIEZ:  Well, I mean, that's what she just testified that it was five years when she asked -- when you asked the question.  He says, I understand that he was here until the five.  You know, that's what she remembers, but I'm just trying to put -- lay it out why he was here for the first, you know, the amount of time. But I'll -- I'll move on, Judge.

Q.  (By Mr. Diez)  So his name was Sada.  Now let's go -- let's go back to them.  You said your dad -- your grandmother Josephina eventually took back -- your dad back to Matamoros, correct?

A.  That's right.

Q.  And, now, do you know where they moved?

A.  In Mexico?

Q.  Yes.

A.  In Matamoros.

Q.  So and did your dad had anymore brothers and sisters?

A.   He had a brother before him.

Q.   What was the name of that brother?

A.   Younger than him.  His name was Santos Saenz.

Q.   Was he older than him?

A.   Older than him, yes.

Q.   And was that through the same father or they have different fathers?

A.   No, they were half brothers.  His father passed away.

Q.   Do you ever met him?

THE COURT:  Mr. -- Mr. Diez, again, come -- let -- let's get to Leonel Cano.  I don't need anything about the grandfathers.

MR. DIEZ:  Okay.

Q.   (By Mr. Diez)  Now, you said -- do you -- do you know if your father went to school?

A.   No.

Q.   So do you know if your father knew how to write in English?

A.   I don't think so.

Q.   And do you know if he spoke English?

A.   No, I don't think so.

Q.   Okay.  Your father, do you know when your father start working and what age was he when he start working?

A.   According to the stories, according to what I

heard is that he was very young when he came to work here in the United States.

Q. Okay. Do you know what age, you know, you're talking about being very young?

A. 14.

Q. Okay. And did -- as far as you know, did he always work in the United States before 1963 that your brother Omar was born?

A. Yes.

Q. Do you know what places he worked? I'm not talking about the business, I'm talking about what cities where he worked.

A. I would hear that he would go to Chicago and Houston.

Q. Okay. And let me show you what's been marked as exhibit number 23, plaintiff exhibit number 23. And I'm going show you this is a -- a picture. Can you tell me who that person is?

A. He's my father.

Q. Okay. And do you know where that picture was taken?

A. I heard that it was taken in Chicago.

Q. And this picture has an October '56 date. You were not born, so is that how he -- you were -- is that how he looked when you remember him or he's -- is that a

younger picture?

A.    Yes, and I would -- I used to look at this picture when I was a little girl.

Q.    Your mother had it at the house?

A.    Yes, at an album.

Q.    So -- so your testimony is that she -- that your rec -- your understanding was your dad was working in Chicago and Houston before your brother Omar was born, correct?

A.    That's right.

Q.    Now, what is, you know, the -- when we were having depositions, they asked you about what is your first memory of your father.

A.    Well, I was very little, very little, but I remember taking small items from here, from the United States, for example, toys.

Q.    He would take them to you?

A.    Yes.

Q.    Okay.  And that's when he would come over to visit you and the family?

A.    That's when he would come over to visit.

Q.    As far as you know, did your father ever live with his family before Omar was born on a daily basis while he was working in the United States?

                    MR. MOORE:  Objection, Your Honor, this

calls for hearsay because it's before petitioner's birth and thus before Maria's birth.

THE COURT:  Rephrase the question in terms of family history.

Q.  (By Mr. Diez)  Did -- did you know if your dad always worked in -- in -- in the United States before Omar was born?

MR. MOORE:  We -- we would, again, object that -- that the answer would call for hearsay because it's -- it's not personal knowledge given that it predates her birth.

THE COURT:  Court will overrule.  Again, I -- court is going to allow leeway for -- for family history.

MR. DIEZ:  Can you ask her?

MR. MOORE:  And, just for the record, understood, Your Honor, we'd just object the family history exception, we think, covers more seminal moments of baptism and birth and death and communion and that kind of stuff but not so much periods of physical presence.

And, in fact, I think courts have found that that is kind of excepted from it because it's not part of these really important -- not considered part of the important events that happen to a family and that are

passed down.

THE COURT: Well, again, the objection -- back to my point, rephrase the question. I'm going to allow employment, her understanding of his employment history to be part of the family history. So -- so just, again, ask her what her understanding is of his employment history in the United States.

Q. (By Mr. Diez) So what was your -- what is your understanding of employment history of your father before Omar and what cities he worked?

A. I remember that he was working in Chicago, he was cutting trees. And, honestly, all his work history was not with companies, he was working, like, in person, with other persons.

Q. Now, and you heard that from your mother, do you met -- you testified that -- do you also heard it from your father's mother?

MR. MOORE: Objection to hearsay, Your Honor.

THE COURT: Overruled.

You're asking who else she heard this history from?

MR. DIEZ: Yeah.

THE COURT: How many people did you hear this family history from? List the names.

THE WITNESS:  My mom, that would be my uncles.  But, I mean, I really heard anything, just very little because I was very little and -- and I heard it from my grandmother.

Q.  (By Mr. Diez)  You're talking about your grandmother the one that is your father's mother, correct?

A.  Yes, on my father's side.

Q.  Is that Josephina?

A.  Josephina Cano.

Q.  And you were --

THE COURT:  Again, one second.  My question was more specific in terms of -- you're -- you're testifying to the court that your understanding from your family history is that your father worked in the United States.  And I quite simply am asking, please list -- give me a list of the names of every person that ever told you that, that you can recall.  And I'm not limiting it to when you were young, I'm -- I'm -- during your lifetime, who told you about this history?  Was it your mother?  Your grandmother?  Your uncles?  Your father?

If so, or maybe not, I don't know -- I don't know, give me a list of names of who you heard this history from.  Not what they said, just identify the

individuals.

THE WITNESS:  Okay.  That would be Oralia Cano, Josephina Cano, Magdalena Lopez, Leonel Cano.  That's it.

THE COURT:  Please proceed.

Q.  (By Mr. Diez)  And we're talking Leonel Cano, your father, correct?

A.  That's right.

Q.  Now, do you -- do you -- do you live with your grandmother Josephina?

A.  Yes.

Q.  And that was Leonel's mother, correct?

A.  My father's mom.

Q.  And do you remember how old were you -- were you when she passed away?

A.  Eight years old.

Q.  And that would have been 1973 when she passed away?

A.  Yes.

Q.  I'm going to show you what's been marked as plaintiff's exhibit, that's another picture, let me just show it to you, and see if you can tell me who this -- who is in that picture and do you know what is this picture about.  It's number 10.  Do you know who's in that picture?

A. I think so. So that one is my father.

Q. The -- the one that is here (indicating).

And then, the other people, do you know who they are?

A. My mom and I think these are my siblings.

Q. So this is a picture that happened after you were born?

A. Yes. I do remember this picture, but I don't remember who each one of them is because I have not seen this picture in a long time.

Q. Well, I'm almost finished. So -- because I'm going to -- really only interested on what you know about the family history about your father before the age of -- before he was -- when he was 30 years old when your brother was born in 1963. Based on what you know about your father and the history of him where he was born and he worked, do you believe that he was in the United States for more than half of those 30 years?

A. Yes.

Q. Was it a lot more?

A. I think it was -- I think more than that.

MR. DIEZ: I'll pass the witness, Judge.

CROSS-EXAMINATION

BY MR. MOORE:

Q. Morning, Maria.

A.    Good morning.

Q.    Okay.    So I don't want to ask you to repeat much of what you said already, but I just want to confirm that your birth date is October 8th of 1965?

A.    That's right.

Q.    And you are the youngest child; is that correct?

A.    Yes.

Q.    And how many siblings do you have?

A.    Five males and two females.

Q.    And Omar, of course, is one of your brothers, correct?

A.    Yes.

Q.    And I believe you testified that he was born in September of 1963?

A.    That's right.

Q.    So the difference between you and Omar is approximately two years?

A.    Two years, yes.

Q.    Now, Oscar is -- is one of your brothers as well, correct?

A.    He's the oldest one, yes.

Q.    He's the oldest and he was born in September of 1953; is that right?

A.    Yes.

Q.    And so your age difference is about 12 years with

him?

A.   Yes.

Q.   And then you have another brother named Leonel, correct?

A.   That's right.

Q.   And he was born in May of 1956; is that right?

A.   Yes.

Q.   Okay.  So moving on to your father, your father was born in the United States, as you said, but then sometime after his birth he went to live in Mexico, correct?

A.   Yes.

Q.   And that obviously was before you were born, fair?

A.   Yes.

Q.   Now you testified on direct, if I heard you correctly to Mr. Diez, that you have heard that your father stayed in the United States until he was about five years old.  Did you -- did I -- do I have that right?  Did you testify to that?

A.   Yes.  Yes.

Q.   But, Maria, you previously testified, did you not, that based on what you've heard from family members, you think, although you're not sure, that your father was two years old when he went to live in Mexico;

isn't that correct?

A.   Yes.   But the thing is that I wasn't remembering all of this, it took me time to remember all of this. And now that I have -- I've had more time to think on this topic, my mom told me that it was more than time than that.   It was longer than that.

Q.   Okay.   Did your -- did your mom tell you recently that -- that your father was here until he was five years old?

A.   No, in conversations that I was having with her. Because she has dementia and right now there's moments, for example right now that I'm mentioning this, that I remember things because I didn't remember because I was very young.

Q.   Let me ask you this:   When do you say that your mom told you that your father was actually five years old and not two years old when he left the United States for Mexico?

A.   Well, I don't remember, but I've been trying to think and remember and with memories and through conversations with my brothers and uncles and this is what they have been mentioning.

Q.   Okay.   Regarding when your father came back to the United States from Mexico, right, your mother would say that this event happened when your older brothers

were still little, correct?

A.   Yes.

Q.   Okay.  And your oldest brother Oscar was born in 1953, so -- and, I'm sorry, Oscar was born in 1953, correct?

A.   Yes, I think so.

Q.   Okay.  And we covered the birth years of several of your other brothers, so I want to ask you:  In 1956, your brother Oscar would have been only two or three years old, correct?

A.   Two -- two years and some months, I think.

Q.   And then your brother Leonel, who was born in 1955, he would have still been a baby, correct?

A.   I think so.

Q.   Okay.  Both very little at that time in 1956, correct?

A.   They were, I mean, honestly, if you're talking about '56, I mean, they must have been newborns.

Q.   All right.  Let's go a few years later.  1958, your brother Oscar would have been four or five years old, correct?

A.   Right now, my mind -- my mind is not doing the math right now.  I don't have the numbers --

Q.   Okay.  Understood.

A.   -- of '56 or a year.

Q.  Sorry.  Well, if your brother Oscar was born in 1953, would you agree with me that in 1958 he was four or five years old?

A.  '53, about four and a half or five.

Q.  Okay.  And would you agree with me that since your brother Leonel was born in 1955, in 1958 he would have been only two or three years old, correct?

MR. DIEZ:  Your Honor, I will object as to the relevance because I don't know what he's trying to do.  What is he trying to do with this question?

THE WITNESS:  (Speaking Spanish.)

(Simultaneous speaking.)

COURT REPORTER:  Hold on.  Go ahead.

MR. DIEZ:  I'm -- I'm objecting to relevance of those questions.

THE COURT:  That's overruled.

Please proceed.

And -- and, I mean --

MR. MOORE:  I'm -- I'm getting to the part --

THE COURT:  Let's get to the point.

MR. MOORE:  Okay.

THE COURT:  The -- the dates of birth are given, I can do the math so you don't need to keep asking, you know, 58 minus 53.

MR. MOORE:  Okay.

THE COURT:  Let -- let's proceed.

Q.  (By Mr. Moore)  Final question on this, Maria, in -- in 1958, your brothers, Oscar and Leonel, your older brothers, would have been very little, correct?

A.  Yes.

Q.  Okay.  And you do not know the actual year or date that your father returned to the United States, fair?

A.  I do not remember the year, but I -- whatever I heard was years, in years, not dates.  I don't remember hearing dates.

Q.  Let's talk about your knowledge of where in the United States your father worked.  You remember a time in your life when your father was working in Chicago, correct?

A.  That's right.

Q.  And you know that because you actually have a memory of your father sending your pictures -- sending pictures to your mother, correct?

A.  No, I remember that because I would hear about it.

Q.  Okay.  You don't know where in Chicago your father worked; do you?

A.  Not the place.  I know that he was working

cutting trees, he was working on his own, working for houses, working out on the streets.

Q. Okay. You also are able to say that your father worked in Houston after he worked in Chicago, correct?

A. Yes.

Q. And you -- but you don't know the year that he began working in Houston, correct?

A. No, I do not know.

Q. And the information that you've learned about your further -- father's early childhood you learned -- was mostly from your grandmother; is that correct?

A. Through my mom and my grandmother.

Q. Okay. Your mother and your grandmother?

A. Yes.

Q. Now, you do have a memory of your father or mother applying for citizenship on your behalf, correct?

A. I mean, recently I know that I received my citizenship through my father.

Q. And -- but you have a vague memory of your father or your mother actually applying for you on your behalf back when you were a child; isn't that right?

A. I do remember getting my citizenship. Not when they -- they applied, but I do remember when I got it. I was very little, but I do remember that.

Q. Okay. And out of all your siblings you were the

only one who was able to obtain citizenship at that time; is that correct?

A.   Yes.

MR. MOORE:  One minute, Your Honor.

(Brief pause in proceedings.)

MR. MOORE:  Nothing further.  Thank you.

THE COURT:  Mr. Diez, anything else?

THE WITNESS:  Gracias.

MR. DIEZ:  I just wanted to just make sure that, you know, that I want to thank you and -- and know if you want to excuse her to the --

THE COURT:  Just one -- one point of clarification, ma'am, because obviously we've heard different questions, what is your understanding at what age did your father start working in the United States?

THE WITNESS:  Yes.  I would hear that he was around 14 years old when -- that he was very young when he came here to work in the United States.

THE COURT:  And when -- and when you would -- your understanding of this history is when he started to work in the United States he would spend -- how much time would he spend in the United States when he was working in the United States?  What is your understanding of that?

THE WITNESS:  Almost all the time.  He would

hardly come to Matamoros.

THE COURT: All right. Anymore questions, anyone?

MR. DIEZ: No, Judge.

THE COURT: Anything else?

MR. MOORE: No, Your Honor.

MR. DIEZ: Can -- can I -- can I ask the court if she can be excused or she has to stay here because she has to go back to work? If she wants to stay, I don't know if she wants to stay, but do you want to stay?

THE COURT: She's free to, I mean, I don't anticipate any further testimony. Does --

MR. MOORE: We wouldn't anticipate any certainly now, Your Honor.

MR. DIEZ: Thank you, Your Honor.

THE COURT: She's free to leave.

MR. DIEZ: Okay.

THE COURT: Thank you, ma'am.

THE WITNESS: Thank you. I appreciate it.

MR. DIEZ: Can I take a five-minute break, sir? For two minutes because I need to find out where my other witness is. I don't need five minutes.

THE COURT: Let's go ahead and take a very brief recess. We'll be back momentarily.

(Court in short recess.)

THE COURT:  Thank you.  Are we ready to proceed?

MR. DIEZ:  Oh, yes, Your Honor, we are.

THE COURT:  All right.  And who do we have now?

MR. DIEZ:  His name is Oscar Cano.

THE COURT:  All right.

MR. DIEZ:  It's a easy name.

THE COURT:  Buenos dias, Mr. Cano.  Let's -- let's swear him in, please.

THE CLERK:  Raise your right hand.

(Witness sworn in.)

THE WITNESS:  Yes.

THE COURT:  Por favor.  Please have a seat. Mr. Cano, obviously you're here to testify in this case. Please answer loudly and clearly into the microphone. I'm going to ask you a few basic questions and then the attorneys will ask you some questions.

THE WITNESS:  Okay.

THE COURT:  But starting with the basics, please state your full, correct, legal name.

THE WITNESS:  Oscar Luis Cano-Lopez.

THE COURT:  And how are you related to the petitioner Mr. Omar Cano-Lopez?

THE WITNESS:  He's my brother.

THE COURT:  And how old are you, sir?  Are you his older brother or a younger brother?

THE WITNESS:  Yes, I'm the oldest.

THE COURT:  All right.  And when were you born, sir?

THE WITNESS:  September 3rd, 1953.

THE COURT:  All right.  Mr. Cano, obviously we're here to discuss the legalities of citizenship for your brother and the key issue in this case is the amount of time your father, Leonel Cano, spent in the United States before your brother was born in September of '63.  What is your understanding of the amount of time that your father spent in the United States before September of 1963?

THE WITNESS:  About ten years.

THE COURT:  All right.  And, if you could, please be a little bit more specific.  Obviously he was born in the United States, but also lived in Mexico.  So tell me what is your understanding of when he lived in the United States and/or when he worked in the United States.

THE WITNESS:  You mean during which timeframe?

THE COURT:  Again, sir, your father was born

in August of 1933.

THE WITNESS:  Uh-huh.

THE COURT:  And when your brother was born in September of '63, he was just over 30 years old.

THE WITNESS:  Yes.

THE COURT:  All right.  What is your understanding of how much time he spent in the United States before the age of 30 years old of age?

THE WITNESS:  Well, he left to Mexico when he was five years old and then he came back.  He was around 14 years old when he came here and he was crossing all the time.

THE COURT:  All right.  Let's break that down a bit.  Is it your understanding that he lived in the United States from the time of his birth until he was the age five?

THE WITNESS:  At five years old he left to Mexico.

THE COURT:  All right.  And what is your understanding of when he returned to the United States?

THE WITNESS:  Well, I do not know that, I mean, I'm not aware of when he came back.

THE COURT:  All right.  Do you have an understanding of when he started working in the United States, at what age?

THE WITNESS:  He was around 14 years old, more or less, or 15 years old, more or less.

THE COURT:  All right.  And when you say he would work in the United States, what does that mean?  How much -- how much time would he spend in the United States when he was working here?

THE WITNESS:  I do not know the time, the timeframe, I just knew that he was working here in the United States.  He was working at J&O, J&O clothing stores.

THE COURT:  Mr. Diez, please proceed.

REDIRECT EXAMINATION

BY MR. DIEZ:

Q.  Yes, Mr. Cano, good afternoon, again.  Good morning, I'm sorry.  So your testimony's that he -- your dad was here in -- in the United States up until age of five and then he went to Mexico and start coming when he start working at around 14 or 15, correct?

A.  Yes.

Q.  And -- and we're trying to just ask you about what you know about your father before 1963, okay?  Look -- look at that screen.  I'm trying to find out what you know from your father until 1963 which is when you were around ten years old, okay?  That's a table, do you see it?

A.   Si.

Q.   Now did your father, as far as you know, did he always work from the age of 14 to 1963 in the United States as far as you know?

A.   (No response.)

Q.   Did he always work in the United States?

A.   Yes.

Q.   And -- and don't be afraid, just say yes or no, don't --

A.   It's just that I'm thinking.

Q.   Okay.  And do you know what cities did your father work, if you --

A.   That -- that I know is that he was here in Brownsville at the store that I just mentioned.  And then he was in Chicago and then in Houston.  That's the last one that I know of.

Q.   So you know that he was also working in Chicago and also in Houston, correct?

A.   Yes.  Yes.

Q.   Let me show you exhibit number 23, and it's a picture, tell me if you can tell me who that person is.

A.   My dad, yes.

Q.   And do you know where that picture was taken, if you know?

A.   No, I do not know that.

Q.   You have seen it before, right?

A.   Yes.

Q.   And this picture was on '56, okay, you were three years old back then.  Growing up, before the age of ten, do you have any memories of your father working in the United States and visiting you all?

A.   Yes.  He used to come -- he used to talk with my mom on the phone.

Q.   And, well, because he was in the United States working?

A.   Yes, during that time, he was in Chicago.

Q.   And he would come and stay once in a while with you all or -- from Chicago?

A.   Yes, he would come over, he would come every month or every two months.  He would come and stay with my mom, he'd give her -- give her some money and then he would leave again.

Q.   Now, he lived also -- he worked also in Chicago. Do you know -- Chicago, I'm sorry, in Houston you testified.  Do you -- that was after he worked in Chicago, correct?

            MS. VICK:  Objection, leading.

            THE COURT:  Overruled, I'll allow it.

            THE WITNESS:  Yes.

Q.   (By Mr. Diez)  Do you know if your father had a

family in Houston, too?

A.   I think he had some family, yes, I think so.   But I never met them, but I think he had some family there.

Q.   So those are half brothers that you never have met?

A.   No, I think only one.

Q.   You met one of them?

A.   Yes, I think so, yes.

Q.   And -- and they are from Houston?

A.   Yes.

MR. DIEZ:   I'll pass the witness, Your Honor.

THE COURT:   Mr. Moore, Ms. Vick?

CROSS-EXAMINATION

BY MS. VICK:

Q.   Good morning, Mr. Cano-Lopez.

A.   Yes, good morning.

Q.   Thank you for being here today.

A.   Yes, thank you.

Q.   With respect to your father's early childhood, your testimony is that -- that he first left the United States to go back to Mexico when he was five years old; is that correct?

A.   Yes, he would mention that he went to Mexico because he -- his mom took him to go over there when he

was five years old.

Q.   And, Mr. Cano-Lopez, didn't you previously testify that you don't -- you didn't know when your father first left the United States for Mexico after his birth?

A.   I -- did I say -- I think I said around four years old, no?  Four years old when my grandmother took him over there?

Q.   Do you remember having an interview or a deposition with the government, or with Mr. Moore, my colleague here?

A.   Yes.  Yes.

Q.   And you were asked a series of questions and you gave a series of answers under oath; is that correct?

A.   Yes.

Q.   And you testified under oath to tell the truth?

A.   Yes.

MS. VICK:  Your Honor, I have a binder of the deposition transcripts if you'd like it.  I'm going to read from some of them.

THE COURT:  Please proceed.  Now, I caution -- I always caution attorneys to -- there's nothing wrong with referring back to depo testimony when appropriate, but -- and I'm not saying you're going to do this, but oftentimes I -- it's -- it's an improper

use of depo testimony when the depo testimony does not contradict what was stated on the stand.  So, if we're going to use depo testimony to contradict what was stated, let's make sure it does that.  Nebulous answers like "I don't know" and what have you don't necessarily qualify within that scope but --

MS. VICK:  Understood.

THE COURT:  Please proceed.  Please proceed.

MS. VICK:  Understood.

Would you like the -- the transcript?

THE COURT:  Sure.

MS. VICK:  Okay.  May I approach?

THE COURT:  Well, and you're telling me it's not in this binder?  It's a different binder?

MS. VICK:  No, it's in that binder and it's the second tab.

THE COURT:  Thank you.  And do you have a copy for your questioning?

MS. VICK:  I do.

THE COURT:  Okay.

MS. VICK:  Yes.

THE COURT:  Please proceed.

MS. VICK:  And I'm going to be reading from page 19, okay, page 19 -- page 19, lines 7 through 10 and 18 through 25.

THE COURT:  And it appears to be highlighted in gray; is that correct?

MS. VICK:  It may be.

THE COURT:  All right.

MS. VICK:  But --

MR. DIEZ:  Page what?

THE COURT:  All right.  Please proceed. Page -- oh, I'm sorry, page 19.

MS. VICK:  Page 19, lines 7 through 10.

THE COURT:  Okay.  Forgive me, that is not highlighted in gray, I -- I was just looking quickly. Please proceed.

MS. VICK:  Okay.

Q.   (By Ms. Vick)  Question:  Okay.

THE INTERPRETER:  Counsel, may you put it on the screen for the Interpreter's benefit?

MS. VICK:  Oh, sure.

Q.   (By Ms. Vick)  Question:  Okay.  I'm asking about your father's childhood, actually, and I want to see if you have any knowledge of his childhood.  Okay?

Answer:  My father's childhood, I don't remember.

MS. VICK:  Moving down to line 18.  Moving down to line 18.

Q.   (By Ms. Vick)  Question:  Sure.  So do you have

any idea, for instance, where your father lived as a five-year-old boy?

Answer:  When he was five years old?

Question:  Yes, when he was five years old. Sorry, yes, when he was five years old.

Answer:  I don't remember, no, I just -- I don't remember, no.

MS. VICK:  And moving on to page 20, line 2.

Q.  (By Ms. Vick)  Question:  Sure.  And I will just ask you another age.  Do you have any idea where your father was living when he was, say, ten years old?

Answer:  I don't know.  I don't know.  I would think he was living in Matamoros, maybe Matamoros and then he came to Brownsville.  I don't know.

A.  That's right.

Q.  So, Mr. Cano-Lopez, is it -- does it remain your testimony today that your father first left the United States for Mexico at the age of five years old?

A.  Yes, his mom took him over there.

Q.  And I guess I first should have asked were you asked those questions and provided those answers?  Do you recall that?

A.  No, I don't remember.

Q.  Do you remember having an interview and being asked questions by the government?

A.   Yes.  Yes.

Q.   Okay.  But, I guess, is it your testimony that you don't remember the exact questions and answers you provided?

A.   Right now, I don't remember, no.

Q.   Okay.  So with respect to your father's time when he came back to the United States to work, you remember your father worked in Chicago when he was -- when you were a child, correct?

A.   Yes, yes, that's right.

Q.   But you don't know when your father first went to work in Chicago, correct?

A.   No, I do not know.

Q.   And you don't know what year your father first left Mexico to go work in the United States, correct?

A.   No, no, ma'am.

Q.   And you don't know at what age your father first left Mexico to go to work in the United States, correct?

A.   No, I do not know what age.  He was already working over there.

Q.   And when your father was working in --

THE COURT:  I'm sorry, I didn't hear that last part.  What -- what -- translator, again, translator speak up into the microphone.

THE INTERPRETER:  Yes.

THE COURT:  The last part of the sentence, what -- what was said?

THE INTERPRETER:  His answer was he was already working over there.

THE COURT:  Please proceed.

Q.  (By Ms. Vick)  When your father was working in Chicago, he would come home to Mexico and stay maybe a week with your family; is that correct?

A.  No, he would come and stay here in Brownsville with my mom and then he would go visit my mom again and then leave again.

Q.  And you're unclear about what period of time he would come to visit your mom and your family during that period; is that correct?

A.  Yes, I do not remember.

Q.  And you don't know for how long your father worked in Chicago; is that correct?

A.  No, no, I don't remember how long.  When I got married, he came over, but then he left again.

Q.  And your father worked in Houston after working in Chicago, correct?

A.  Yes.

Q.  But, again, you don't know the dates that he began working in Houston, correct?

A.  No.  No.

MS. VICK:  I have no further questions.

THE COURT:  Mr. Diez?

REDIRECT EXAMINATION

BY MR. DIEZ:

Q.  Yeah.  I don't -- we don't have that many more questions but let -- let me just -- one thing is that you don't know the exact dates your dad began working in Chicago, but your testimony is that you know that he worked in Chicago for numerous years; is that correct?

A.  Yes, that's right.

Q.  And that he also worked in Houston for numerous years sometime after Chicago?

MS. VICK:  Objection, leading.

A.  That's right, yes.

COURT REPORTER:  Leading?

THE COURT:  That's overruled.

COURT REPORTER:  Did you say leading?

MS. VICK:  Leading, yes.

COURT REPORTER:  Thank you.

Q.  (By Mr. Diez)  And that he had a family in Houston that he lived with and you met one of their -- your half siblings, correct?

A.  Yes, only one of them, yes.

Q.  And that your father always worked in the United States as far as you know?

A.    That's right.

Q.    And that he began working sometime when he was 14 or 15?

A.    Yes, that's right.

MR. DIEZ:   I'll pass the witness, Judge.

THE COURT:   Ms. Vick, anything else?

MS. VICK:   No, no further questions.

THE COURT:   And I'll allow follow-up.

Mr. Cano, let -- let's try and be a -- a bit more specific.  Obviously you were ten years old when your -- your brother was born.  As best you can recall, what was the standard calendar for your father's work in the United States?  For example, how many months out of a year would he be in the United States and how much time would he spend visiting either in Brownsville or Matamoros?

THE WITNESS:   And you're asking me about the time that he worked in Brownsville or Houston?

THE COURT:   No, I am not limiting it in scope to Brownsville or Houston, I want you to tell me what your memory is of his calendar.  Hypothetic -- let -- let's go for -- when you were ten years old, what do you recall was his calendar for visiting you in terms of how many months out of the year?

THE WITNESS:   Like three or four months in a

year.

THE COURT: All right. So -- and I want to clarify that -- what you're saying is that out of -- out of 12 months in a year you -- you -- your memory is that he would visit for approximately three to four months out of that year. And when he visited, would it be in Matamoros or would it be in Brownsville?

THE WITNESS: I don't remember how long because my mom was in Mexico and then she would go over but then she would come back so I don't know how long.

THE COURT: All right. And, again, I'm not talking about your mom, I'm -- I'm -- and I know it's difficult because, you know, even at the age of ten it -- it may be difficult to remember, but I'm -- I'm asking about your personal knowledge at the age of ten how much time do you estimate you saw your dad when you were ten years old out of -- out of that one year?

THE WITNESS: I would see him like every three or four months when he would come over, that's when I would see him.

THE COURT: Okay. And when you saw him every three or four months, how much time would he stay?

THE WITNESS: He would stay maybe like three or four days and maybe sometimes a week, but the most that he would stay was three or four days and then he

would leave.

THE COURT:  And where did you live when you were ten years old?

THE WITNESS:  In Matamoros.

THE COURT:  All right.  Any follow-up questions by either side?

MR. DIEZ:  No, no, Your Honor, I have nothing.

THE COURT:  Thank you, sir, you may step down.

THE WITNESS:  Okay.  Thank you.

MR. DIEZ:  Judge, can I ask a -- a question?

THE COURT:  Sure.

MR. DIEZ:  More like a -- I just -- my -- my other witness just arrived, which is my last witness besides the plain -- and she just got from dialysis.  It is -- I don't know if the -- what is the court's plan? Are they going to break for lunch or are they going to -- if you want me to first find out how she's feeling and -- and then secondly if the court wants to -- me to go forward and finish her if she's -- finish her, I mean, take her testimony or if she wants to go break for lunch?

THE COURT:  All right.  It's only 11:20, I have no plans to break for lunch any time soon.

MR. DIEZ:  That's fine, but can I just find out how she's doing and -- and I --

THE COURT:  Now, if she needs -- if she needs a break, that's a different issue, I -- I'll --

MR. DIEZ:  The -- the reason I'm saying is because when I talked to the family, I haven't talked to her, they she told me that when she gets dialysis she gets very, very weak.  I don't know, so I just want to ask her right now how she's doing and -- but I know she's outside.

THE COURT:  Let's do -- let's do this, so let me -- let me clarify what -- let's go off the record.

COURT REPORTER:  Yes, sir.

(Court in short recess.)

THE COURT:  All right.  Let's go ahead and swear in the witness, please.

THE CLERK:  Please raise your right hand.

(Witness sworn in.)

THE WITNESS:  I swear.

THE COURT:  Good morning, ma'am.  Please state your full, correct, legal name.

THE WITNESS:  Good morning.  My name is Magdalena Lopez.

THE COURT:  Baje le mano.  Ms. Lopez,

obviously you're here to testify on behalf of Mr. Omar Cano-Lopez.  What is your relationship with Mr. Omar Cano-Lopez, the plaintiff in this case?

THE WITNESS:  He's my political nephew because he was my husband's nephew.

THE COURT:  And the key issue in this case is the amount of time Mr. Leonel Cano lived in the United States.  Before we get to that issue, what is your relationship with the plaintiff's father Leonel Cano?

THE WITNESS:  Concuno meaning he was my husband's brother-in-law.

THE COURT:  All right.  And what is your date of birth, ma'am?

THE WITNESS:  July 22nd, 1941.

THE COURT:  Thank you.  And going back to what I said was the key issue in this case, Mr. Leonel Cano was born in August of 1933 --

THE WITNESS:  Yes.

THE COURT:  -- and the plaintiff in this case was born in September of 1963?

THE WITNESS:  Yes.

THE COURT:  All right.  So the key issue is what knowledge, if any, do you have of Mr. Leonel Cano's time in the United States between his date of birth in

'33 and the plaintiff's date of birth in '63, which is just over 30 years?

THE WITNESS:  Yes.

THE COURT:  Again, please explain to the court what knowledge you have, if any, of his time spent in the United States during this time period.

THE WITNESS:  Well, I -- I met him in one year before I got married, I met him in '59.  And I knew that he was already coming here because we were spending time together, meaning my sister-in-law, I would spend time with her, and he would send her money.  He was working in Chicago.  And then I -- I came here and, I mean, I would see him, but not as frequent.  I think it was in 1970.  I also know that he was working in Houston.  I don't know what jobs he did, but I -- I know he was there.

THE COURT:  And, again, do you have an understanding of when he started working in the United States?  At what age he started working in the United States?

THE WITNESS:  I do not know because I did not ask him.  But when I met him, I knew that from that point forward when I met him I knew about it, but not when he was younger.

THE COURT:  All right.  So let's break that

down a bit.  Is it your testimony that you have no knowledge of the amount of time he spent in the United States before you met him in 1959?

THE WITNESS:  No, not back then.  But then, after '59, yes.

THE COURT:  Okay.  Now let's -- now let's move to '59.  Once you got to know him, out of the span of one year, how much time would he spend in the United States?  Now I'm talking '59 and onwards.

THE WITNESS:  More than six months, for sure, yes, because he would leave Chicago during the winter because it was very cold.  So he would leave to come back.

THE COURT:  Thank you, ma'am.

Mr. Diez?

DIRECT EXAMINATION

BY MR. DIEZ:

Q.  Thank you very much.  I will be brief, okay?  So you told the court you were born in '41.  And you are married to Jesus, right?

A.  Si.  No, Cesar.  And I think he probably met him before I did.  My husband knew -- knew more about Leonel.

Q.  And Cesar was the brother of Oralia which is Leonel's wife?

A.   Yes, the wife, yes.

Q.   Now, you -- how long do you dated Cesar?

A.   We dated eight years and we were married for 63 years.

Q.   Okay.  You testified that you were married in 1960, so you got married when you were 19?

A.   Yes.

Q.   And you dated him since you were 11?

A.   Because he kept saying that I was his girlfriend, but we were not dating.  So he considered me his girlfriend ever and then we were married --

Q.   So you know him since 1952?

A.   -- for 63 years.

     More or less.

Q.   And do you met his sister Oralia when you met him?

A.   Yes, I met Oralia in '55 or '52.  We didn't really hang out together because I was over here.

Q.   When you met Oralia she was already married to Leonel, correct?

A.   Yes.

Q.   And, if you remember, was Leonel already working here in Chicago when you met her?

A.   Yes.

Q.   So you -- since you know Oralia, Leonel was

working in the United States?

A.   Yes, yes, yes, I remember now, yes, I always knew that he was working in Chicago.

Q.   And -- and you -- you actually talked to Leonel at one time about his work in Chicago?

MS. VICK:   Objection, leading.

THE COURT:   Overruled.

A.   No, no, I mean, I knew that he was working over there but we didn't really spend that much time together.   He would -- when he would come over, we would go out with all the children.

Q.   (By Mr. Diez)   Oralia went to your wedding in 1960?

A.   Yes.   Yes.

Q.   What about Leonel?

A.   No, he wasn't here.   He didn't come.

Q.   Where was he?

A.   In Enero.

Q.   Huh?

A.   In Enero me canse.

Q.   Yeah, where was Leonel?

A.   I got married in January.

Chicago, that's where I knew he was all the -- all the time.   And I can say that for sure because he used to send checks.

Q.  To Oralia?

A.  Yes, to Oralia for the children.

Q.  Okay.  And -- and you got married in January of 1960 in Matamoros?

A.  No, that was here.  Here.

MR. DIEZ:  I'll pass the witness, Your Honor.

THE COURT:  Counsel, Ms. Vick?

CROSS-EXAMINATION

BY MS. VICK:

Q.  Good morning, Ms. Lopez.

A.  Buenos dias.

Q.  Thank you for being here today.

A.  Good morning.  Good morning.

Q.  You don't know the exact dates that Leonel was working in Chicago between the years of 1953 and 1960; is that correct?

A.  Yes, I do not know the dates but I know he was working.

Q.  You don't know the timeframes that he would come and go from the United States to Mexico during that timeframe; is that correct?

A.  No.  Maybe he would come for -- maybe he would come two months, but -- because I was working here, so we didn't really spend that much time together, I didn't

really see him, only on -- when we'd gather as a family.

Q.   And you don't know when Leonel began working in Houston; is that correct?

A.   I do not know.  I knew he was working there and we used to visit him, I mean, my husband would look for him and he -- we would go out and eat, but other than his work, I don't -- I do not know.  But I knew that he was working there.

Q.   And after you married in 1960, you remember Leonel living in the United States for about six or seven months out of the year; is that correct?

A.   Yes.

Q.   And he would come back to Mexico for the winter months; is that correct?

A.   Yes, only to come and see his children, spend time with his children, all of that.

Q.   But you don't remember exactly how long he would stay during those winter periods; is that correct?

A.   No, I do not remember that much.  But, like I said, maybe like two months or -- maybe or so.

Q.   Okay.  Now I just have a few questions about Omar's mother Oralia.

A.   Yes.

Q.   You still visit with Oralia; is that correct?

A.   Yes.

Q.   And I believe you'd previously testified in an interview with the government that her mind is -- is gone a lot, I believe that's what you said; is that correct?

A.   Yes, a lot, yes, she doesn't react anymore.

Q.   And you believe she has Alzheimer's; is that correct?

A.   Yes.

Q.   And do you remember for how long she has had this condition?

A.   Gosh, I don't remember.  Now it's worse, I mean, she doesn't know you anymore.  But she's had it for a while.

Q.   In your opinion, has she had this condition for several years?

A.   Yes.

MR. DIEZ:  Your Honor, I will object, that's speculation on how would she know how long she have Alzheimer's.

THE COURT:  Overruled, I'll allow it.

Q.   (By Ms. Vick)  And did you spend -- did you see Oralia around the Christmas holiday of 2022?

A.   I don't remember.  I'm also not all there.

Q.   Do you typically see Oralia during the Christmas holiday?

A.   Sometimes, not always.  I mean, sometimes I see her in other gatherings or parties, but now I'm the one that visits her.

Q.   Okay.  And do you have any recollection of seeing her during the Christmas 2022 holiday?

A.   Gosh, no, I don't think so.  No, I don't remember.

Q.   Okay.

MS. VICK:  No further questions.

THE COURT:  Mr. Diez, anything else?

MR. DIEZ:  No, Your Honor.

THE COURT:  Thank you, ma'am, you may --

es todo, Gracias.

THE WITNESS:  Thank you.

THE COURT:  Mr. Diez, does the -- does the plaintiff rest?

MR. DIEZ:  Yes, Your Honor, we do.

THE COURT:  Ms. Vick, Mr. Moore, anything else on behalf of the respondent?

MR. MOORE:  A couple items, Your Honor. We'd ask the court to take judicial notice of a particular event relevant to the history of this case, which is simply that there was petition for review filed by Mr. Diez on behalf of the petitioner on November 10th of 2022, meaning this -- this case's origins were back

in 2022.  And I have the Fifth Circuit filing here the petition of review.  And it's just kind of a -- a marker of for how long this case, you know, the -- the date at which this case began in terms of -- of potentially relevance for -- towards other evidence.

THE COURT:  You're asking me that I take judicial notice of this document, is -- is it part of the exhibits or you just want me to take judicial notice?

MR. MOORE:  It's not part of the exhibits but I -- I have a copy and can show counsel a copy, it's a public filing with the Fifth Circuit.

THE COURT:  All right.  Well, court will take judicial notice of the public filing.

MR. MOORE:  Okay.

THE COURT:  And feel free to leave a copy with the court.

MR. MOORE:  Okay.  Great.  Thank you, Your Honor.

REPORTER'S CERTIFICATE


     I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled
matter.



                              _/s/_____
                              SHEILA E. HEINZ-PERALES
                              CSR RPR CRR